**2025 UT App 177**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
FELIPE HERNANDEZ-RIVERA,
Appellant.

Opinion
No. 20230850-CA
Filed December 4, 2025

First District Court, Brigham City Department
The Honorable Spencer D. Walsh
No. 051100183

Matthew R. Morrise and Douglas J. Thompson,
Attorneys for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     After a jury trial, Felipe Hernandez-Rivera was convicted of one count of rape of a child and five counts of sexual abuse of a child. He appeals his convictions, arguing that (1) the district court erroneously excluded evidence of the victim's prior sexual behavior under rule 412 of the Utah Rules of Evidence when an exception to the rule allowed the admission of such evidence, (2) the court erred in refusing to admit this same evidence when the State opened the door to its presentation at trial, and

(3) defense counsel (Counsel)[1] rendered ineffective assistance both by (A) failing to seek admission of the rule 412 evidence in an additional instance where the State had opened the door to it and (B) stipulating to a jury instruction that misstated the law. We disagree with each argument and affirm.

BACKGROUND[2]

¶2 Twelve-year-old Sadie[3] met nineteen-year-old Hernandez-Rivera in August 2003 when she was hanging out at a local bowling alley with a friend. The two began flirting and getting "a little closer physically to each other" that first day, and Hernandez-Rivera asked Sadie if she wanted to be his girlfriend. Sadie "was hesitant at first because of [her] concern of his age" (he had told her he was sixteen), but she was enjoying that Hernandez-Rivera "showered" her with compliments that "made [her] feel good," so she "ultimately said yes."

¶3 Hernandez-Rivera and Sadie met up at the bowling alley again the following week, and the flirting and closeness "pick[ed] right back up again." At some point, the two left to go for a walk, and during that walk Hernandez-Rivera held Sadie's hand and kissed her. But while the two were out walking, someone saw

---

1. In the district court proceedings, Hernandez-Rivera was represented by two attorneys. Because it is unnecessary to distinguish between the two in analyzing and addressing the issues raised on appeal, we refer to a singular "Counsel" for simplicity.

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

3. A pseudonym.

them, recognized Sadie, and then reported to Sadie's mother (Mother) that Sadie was out walking with "someone that looked like . . . an adult." Mother was "very upset" that Sadie was not at the bowling alley like she had said she would be and told Sadie that she was "not allowed to go back to the bowling alley anymore."

¶4      Sadie then began meeting up with Hernandez-Rivera at a trailer park where several of his friends would hang out. Sadie would tell Mother that she was going out for a walk and then walk to the trailer park to hang out with Hernandez-Rivera. Sometimes Sadie and Hernandez-Rivera would "sit in his car alone," "go for drives alone," or "go for really short walks alone." The meet-ups at the trailer park occurred over the course of the next few months, during which time "the physical closeness escalated" to include Hernandez-Rivera touching Sadie's buttocks and breasts over her clothing as well as him making attempts to reach his hand under her clothing. Sadie was initially unreceptive to the increased touching, but she "became more and more receptive as the frequency continued to increase," later remarking that she "was being buttered up and worn down" during this period.

¶5      As the weather outside started to turn colder, Sadie also began to take Hernandez-Rivera to her grandmother's house, where she would often stay over to provide help to her grandmother. Because Sadie knew her grandmother "would not have approved" of her bringing a boy inside the house, Sadie would sneak Hernandez-Rivera into a basement bedroom before going to tell her grandmother she was home and saying goodnight.

¶6      During the first of these encounters, in September 2003, while Sadie and Hernandez-Rivera were lying on the bed in the basement bedroom together, Hernandez-Rivera made "more advances to try to gain entry into [Sadie's] clothing." He repeatedly tried to put his hands up under her shirt or down her

pants. Sadie was "very adamant that [she] did not want to have sex," and it was important to her "that [she] didn't have sex until marriage," so she resisted the touching under her clothing. And when she did, Hernandez-Rivera "would ease up, and then go back to the compliments and the kissing and the grooming." But then, gradually, Hernandez-Rivera would repeatedly return to attempts to get underneath Sadie's clothing. At some point during the night, Hernandez-Rivera did "shove his hand down [her] pants" and "made contact with [her] vagina underneath [her] underwear." He also "shove[d] [Sadie's] hand down his pants," and she "did make contact with his penis," even though she "wasn't wanting to do that at all." Hernandez-Rivera eventually left "really early" in the morning, and Sadie went upstairs to the couch in the living room, where she was supposed to be sleeping.

¶7     Sadie had another encounter with Hernandez-Rivera in the basement of her grandmother's house about a week later. This encounter went in largely the same manner as the prior one, with Hernandez-Rivera "slowly work[ing] to try to get under the [clothing]" and eventually succeeding in "his hand making contact with [her] vagina" and her "hand making contact with his penis." But at some point during this encounter, they heard Mother coming down the stairs calling for Sadie. Hernandez-Rivera, who at this point "was only in his socks and his boxer briefs," "flew out of bed really fast and started grabbing . . . his clothes" and belongings. Mother entered the bedroom, turned on the light, discovered Hernandez-Rivera with Sadie, and began yelling at him. Hernandez-Rivera "shoved past" Mother, "who was trying to block the door," and he "flew up the stairs" and out the back door. Mother called the police, who came and "took a statement" and then searched for Hernandez-Rivera but were not able to locate him.

¶8     After Mother's discovery, Sadie was no longer allowed to stay overnight at her grandmother's house. Nonetheless, Sadie continued telling Mother she was going for walks and then

meeting up with Hernandez-Rivera at the trailer park. Sometimes, he took her to his house, where more of the "same things" occurred, with him "continuing to pressure [her] for sex." Although Sadie was "still very confused and uncomfortable with" the idea, she became "worn down over time" and "physically more receptive to maybe trying." During one visit to his house, Hernandez-Rivera finally convinced Sadie to have sexual intercourse with him.

¶9    Sometime after this encounter, Sadie wanted to "write down [her] thoughts" and so began to make journal entries about her relationship with Hernandez-Rivera. Mother found Sadie's journal and hired a locksmith to open the lock on the journal. Mother was "[h]orrified" by what she discovered in the journal regarding Sadie's sexual relationship with Hernandez-Rivera (who was identified in the journal by only his first name). Mother again contacted the police, who opened an investigation. Sadie, for her part, "was scared" and "withheld information" from the police at this time, so the police initially had only a first name to work with.

¶10    "[S]hortly after" Sadie wrote her journal entries about Hernandez-Rivera, she was "grounded at [Mother's] house" and was "not allowed to leave the house." So she did not see Hernandez-Rivera again until the spring of the following year, when she ran into him while visiting a fast-food restaurant with her friends. After talking for a little while, the two left together, and Hernandez-Rivera took Sadie to his house. There the two engaged in sexual intercourse again.

¶11    Around this time, Sadie, who had been doing well in school and doing "really good hanging out with kids [her own] age," "convinced [Mother] to unground [her]." This allowed Sadie to frequently sleep over at her friend's house, and she would often sneak out of her friend's house to go to Hernandez-Rivera's house. Sadie and Hernandez-Rivera continued to have

sexual intercourse during this period of time. But by early summer, the relationship ended because Hernandez-Rivera "disappeared."

¶12 About a year after the police had initiated their investigation, Sadie began to be more cooperative in providing information regarding Hernandez-Rivera. And in January 2005, she provided the police with a hair, explaining that one time after she and Hernandez-Rivera had sexual intercourse, "she had found a pubic hair in her underwear and she'd kept it." The police entered the hair into evidence, but it was not submitted to the crime lab for testing at that time.

¶13 In May 2005, the State had gathered sufficient information to file charges against Hernandez-Rivera for one count of rape of a child and five counts of sexual abuse of a child, based on the encounters with Sadie. A warrant was issued for his arrest, and the police tried various means to determine his whereabouts. At some point in that search, the police were told that Hernandez-Rivera "was no longer in the country," and shortly thereafter the case "went cold."

¶14 Thirteen years later, in November 2018, one of Sadie's friends contacted her to tell her that Hernandez-Rivera had a Facebook page. From this discovery, Sadie "had a strong suspicion that [Hernandez-Rivera] was in North Carolina," and she reached out to the police "to reopen the case at that point." As a result of this lead, the police were able to finally locate Hernandez-Rivera, and he was extradited to Utah in April 2021.

¶15 In the revived case, DNA testing was performed on the hair previously provided by Sadie. Due to "a lot of degradation" in the sample, the "only thing" testing really determined "was that it was a mixture of at least three individuals', male and female, DNA."

¶16    Prior to trial, Hernandez-Rivera filed a motion to admit certain evidence pursuant to rule 412 of the Utah Rules of Evidence. Hernandez-Rivera argued that rule 412 permitted the admission of evidence of Sadie's "prior sexual relationship with an unknown adult male" in order to show that the hair provided by Sadie belonged to someone other than Hernandez-Rivera. *See* Utah R. Evid. 412(b)(1) (establishing that a court may, when the evidence is "otherwise admissible," admit "evidence of specific instances of a victim's sexual behavior" if the purpose is "to prove that someone other than the defendant was the source of semen, injury, or other physical evidence"). Specifically, Hernandez-Rivera sought to introduce evidence at trial that in May 2003—approximately five months before the alleged crimes occurred in this case—Sadie had met up at a motel with a man named Edmundo, the two "engaged in sexual acts," and "he 'attempted' penetration."

¶17    After hearing oral argument, the district court ultimately denied the motion to admit evidence of the Edmundo encounter because it was not admissible under the balancing test of rule 403 of the Utah Rules of Evidence. Looking first to the probative value of the evidence of Sadie's encounter with Edmundo, the court determined that the evidence was relevant and had "some probative value" due to the inconclusive nature of the DNA results and the resulting fact that Edmundo was at least "a possible source for the pubic hair." But the court determined that the probative value was nonetheless "only slight" because (1) Sadie and Edmundo "were discovered at the motel by [Mother]"; (2) the "police collected evidence immediately from the motel room, including the used towels, [Sadie's] underwear, which had a stain on it, [and] the bedding involved"; (3) Sadie "underwent an invasive anogenital exam"; (4) Sadie "reported that she'd showered before" the exam; and (5) there was a "remoteness in time to the pubic hair being put in a baggie by [Sadie]" several months later. Considering these facts, the court concluded that "the chances that the pubic hair turned over to law

enforcement" belonged to Edmundo "seem[ed] remote" and that the court had "been presented with no evidence to support such a contention."

¶18 As to the other side of the rule 403 balancing requirement, the district court determined that the evidence involving Edmundo "would have an undue tendency to suggest a decision on an improper basis." The court reasoned that there was a "great potential for improper inferences that [Sadie was] the type of person who would invite sexual contact with an older man who would willingly engage in this type of sexual conduct or that she would be trouble for older men." The court also found that the requested evidence "would inflame, mislead, and distort the jury's deliberative process," and the court expressed its concern "that there could be confusion of the issues because the jury would be hearing about two different cases involving somewhat similar set[s] of facts . . . that could lead to further confusion on these issues." And finally, the court found that admitting the requested evidence would be an "unwarranted invasion of [Sadie's] privacy."

¶19 Summing up its rule 403 balancing, the district court concluded, "[E]ven though the Edmundo evidence does have some slight probative value, that probative value . . . is outweighed by the inherent danger of unfair prejudice, confusion of the issues, and unwarranted invasion of [Sadie's] privacy, and will therefore not be admissible."

¶20 On the first day of trial, before testimony commenced, the prosecutor expressed his intention to discuss Sadie's journal, not for the purpose of showing that its contents were true, but to provide context for Mother's actions in going to the police. The prosecutor anticipated that Mother would say "[s]he saw something in there where . . . [Sadie] had lost her virginity to some guy named Felipe." Counsel was concerned with the use of the term "virginity," thinking that such a mention would open the

door to asking about Edmundo for impeachment purposes. The prosecutor responded that he did not think the door would be open in that case because the Edmundo encounter involved only "attempted penetration" and Sadie may have still considered herself a virgin before she had sexual intercourse with Hernandez-Rivera. The district court stated it could see Counsel's point and that it would prefer to avoid an "incorrect insinuation that [Sadie had] never had sexual activity before." The prosecutor responded that he would direct Mother not to mention "virginity" but to simply refer to statements in the journal that Sadie had engaged in sexual intercourse with Hernandez-Rivera. Both the court and Counsel agreed with this approach.

¶21 Mother was the State's first witness. In spite of the prosecutor's instruction to Mother, the "virginity" language still came up during Mother's direct examination:

> Q. . . . . You opened up [Sadie's] journal. Did you find anything in there that concerned you?
>
> A. Horrified.
>
> Q. What did you find?
>
> A. I was more than worried. I was very concerned.
>
> Q. Did you find anything in regards to a Felipe?
>
> A. Yeah.
>
> Q. What did—what did you find?
>
> A. She was having a relationship with this gentleman, and it indicated sexual activity, things like that.

> Q.      Okay. Did it mention sexual intercourse?
>
> A.      Well, it said that she had—wasn't a virgin.

Counsel objected, and a brief sidebar was held. The district court asked the attorneys for their suggestions to cure the statement, and then the court stated its intention "to order that that last part be stricken, because it wasn't responsive to the question," and to "just move on to the next question" in order to "not draw more attention" to the statement. The court then asked Counsel, "[A]nd then whether or not certain doors are opened, that's for a later discussion, right? Is there anything else you want preserved right now other than your objection?" Counsel responded, "We'll wait and see." The sidebar concluded, the court struck the statement and ordered the jury "to disregard the last portion of the testimony," and the prosecutor continued with Mother's direct examination.

¶22    Counsel thereafter cross-examined Mother. Counsel began with a few questions regarding Mother discovering Sadie and Hernandez-Rivera together in Sadie's grandmother's basement. Counsel then shifted to asking Mother about "some difficulty" Mother had been having with Sadie the previous year and some "defiant behaviors" Sadie had previously been exhibiting. But Counsel then returned to questioning Mother about finding Sadie and Hernandez-Rivera together in the basement and Mother's subsequent discovery of Sadie's journal entries about Hernandez-Rivera. Then the following exchange occurred:

> Q.      So after the incident in the basement, where you found this man—
>
> A.      Uh-huh.
>
> Q.      —didn't know his age, didn't [Sadie] tell you then that she met this man at the bowling alley?

A.   Exactly.

Q.   And then you forb[ade] [Sadie] from going to the bowling alley.

A.   That's correct.

Q.   Okay. But then you found out that she was still going to the bowling alley, correct?

A.   Correct.

Q.   So between September, when the—you found her in the basement, to November at some point—

A.   Uh-huh.

Q.   —so for a couple of months, you tried to put restrictions in place, right?

A.   Correct.

Q.   Okay. But [Sadie] wasn't following those restrictions.

A.   One time, she didn't follow. But after that, she no longer went to the bowling alley. She tried to—that's what I said, she pushed boundaries.

. . . .

Q.   There were times that you indicated to [the police] that, between those times, between when you found her in the basement to the diary—

> A.    Uh-huh.
>
> Q.    —that you didn't know where she was; is that correct?
>
> A.    Yes.
>
> Q.    And that she would sneak out and do things she wasn't supposed to do.
>
> A.    I wouldn't say sneak out. I always knew when she was going somewhere, and she knew what time she had to be home. There had to have been—looking back now, there had to have been a couple of instances where maybe she wasn't where she—she didn't stay where she was going the whole time.
>
> Q.    Okay. Well, isn't it true, though, that before you saw her in the basement with an unknown man, she was found at a hotel a few months before that, and you didn't know—

The prosecutor then objected to this reference to the Edmundo encounter, and another sidebar commenced.

¶23    The district court sustained the objection and instructed Counsel not to "drop bombs like that" without requesting a reconsideration of the prior ruling regarding the Edmundo encounter. Counsel stated her intent was not to reveal the sexual details of the Edmundo encounter but to impeach Mother's testimony about Sadie generally being where she said she would be. The prosecutor responded that there was nothing to impeach because the questioning had been "revolving around the fall of 2003" and the Edmundo encounter had been "months earlier." And the prosecutor also expressed frustration with Counsel

moving forward with questions relating to the Edmundo encounter based on her own assessment that the door had been opened, without first raising that issue with the court.

¶24   The district court agreed that the parties needed to be "very, very careful" with rule 412 evidence; however, it also recognized, "[S]ometimes, even with our best efforts to tiptoe on the line, a witness blurts out something like 'virginity.'" The court instructed, "Before we get anywhere close to anything with the [rule] 412 stuff . . . , we [have] got to make sure to come back and . . . get permission. Okay?" The court then clarified with Counsel the questions that she could ask that would allow reference to the Edmundo encounter for impeachment without a need to disclose any of the details protected by rule 412. And the court reminded the attorneys that "anything related to Edmundo" was "off the table" and that they needed to "stay far, far, far away from any intimation that there's sexual activity going on with other people."

¶25   Cross-examination of Mother then resumed. Counsel returned to asking Mother about her previous statement indicating that Sadie was generally where she was supposed to be and questioned, "But that's not accurate, is it?" Mother, who had been present for the attorneys' sidebar discussion on the matter and knew what was being referenced by Counsel, replied, "Quite honestly, I had not even recalled that incident that you're bringing up now." Mother then proceeded to answer Counsel's questions related to the Edmundo encounter, which included questions about "an incident . . . where [Sadie] was missing for two days," the fact that "the police were called," the fact that the incident "led to an investigation," and the fact that the person involved "was charged with a serious crime."

¶26   After Mother's testimony, the State presented its other witnesses, including Sadie and several police officers involved in the investigation, who provided testimony consistent with the

above description of events. After the State rested, the defense presented its case, which primarily consisted of the testimony of a forensic scientist from the Utah State Crime Lab (who testified as to the degradation of the DNA sample and the resulting limited test results) and Hernandez-Rivera (who testified that he had held hands with Sadie and kissed her, "but no more than that"). The defense then rested.

¶27 The jury was given instructions stipulated by both the prosecutor and Counsel. These included instructions as to the various elements of the charged crimes. For three of the counts of sexual abuse of a child, the jury was instructed that the crime required that Hernandez-Rivera "[c]aused [Sadie] to take indecent liberties with [him]." And a separate jury instruction clarified which charges were based on what alleged conduct, stating that these three counts of sexual abuse of a child were based "on the alleged conduct of [Sadie] touching [Hernandez-Rivera] on his penis" on three specific occasions. Additionally, the jury was provided with the following definitional instruction: "'Indecent liberties' means causing any part of [Sadie's] body to touch the actor's genitals or pubic area."

¶28 The jury convicted Hernandez-Rivera on each of the charged counts. He was thereafter sentenced to concurrent prison terms. He now appeals his convictions.

ISSUES AND STANDARDS OF REVIEW

¶29 First, Hernandez-Rivera contests the district court's denial of his motion to admit certain rule 412 evidence. "We afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (quotation simplified). A district court abuses its discretion when it applies "the wrong legal standard" or when

its decision "is beyond the limits of reasonability." *Id.* (quotation simplified). And "whether the district court applied the proper legal standard . . . is a question of law that we review for correctness." *Id.* (quotation simplified).

¶30     Second, Hernandez-Rivera contests the district court's limited allowances of the use of the Edmundo evidence for impeachment purposes. "When reviewing a [district] court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion." *State v. Eddington*, 2023 UT App 19, ¶ 19, 525 P.3d 920 (quotation simplified).

¶31     Finally, Hernandez-Rivera raises two claims of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

I. Rule 412 Evidence

¶32     Rule 412 of the Utah Rules of Evidence, applicable in proceedings involving alleged sexual misconduct, generally prohibits the admission of evidence that is offered "to prove that a victim engaged in other sexual behavior" or "to prove a victim's sexual predisposition." Utah R. Evid. 412(a). But the rule does provide certain exceptions, including allowing the admission of "evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." *Id.* R. 412(b)(1). Hernandez-Rivera sought to admit evidence that Edmundo sexually assaulted Sadie and that Edmundo was the

source of the pubic hair Sadie provided to the police in 2005. However, such evidence must also be "otherwise admissible under" the remaining evidentiary rules. *Id.* R. 412(b).

¶33  Rule 403 of the Utah Rules of Evidence provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* R. 403. Thus, evidence that may be admitted under rule 412's exceptions must also pass the balancing test of rule 403 in order to be admissible. *Id.* R. 412(b).

¶34  "Evidence is unfairly prejudicial where it has an undue tendency to suggest decision upon an improper basis." *State v. Rallison*, 2023 UT App 34, ¶ 26, 528 P.3d 1235 (quotation simplified). And "evidence may also cause unfair prejudice when it reveals intimate and potentially embarrassing details about victims." *Id.* (quotation simplified); *see also State v. Bravo*, 2015 UT App 17, ¶ 20, 343 P.3d 306 ("[R]ule 403 provides the mechanism to ensure that the privacy and dignity interests of alleged victims are factored into the analysis."). "Rule 403 therefore represents a bulwark against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details falling within [rule 412's exceptions]." *Bravo*, 2015 UT App 17, ¶ 20 (quotation simplified).

¶35  Hernandez-Rivera argues that the district court committed two distinct errors in denying his motion to admit evidence of Sadie's prior sexual encounter with Edmundo. He asserts, first, that the court applied "an incorrect legal standard" in conducting the rule 403 balancing and, second, that the court "misbalanced the probative weight of the [Edmundo] evidence and the danger of unfair prejudice." We address each assertion in turn.

A.     The Applicable Legal Standard

¶36     In describing the relevant law, the district court quoted the following language from *State v. Boyd*, 2001 UT 30, 25 P.3d 985:

> When applying rule 403 to the admissibility of a rape victim's past sexual conduct, there is a presumption of inadmissibility: Such evidence is admissible only when the court finds under the circumstances of the particular case such evidence is relevant to a material factual dispute and its probative value outweighs the inherent danger of unfair prejudice to the victim, confusion of issues, unwarranted invasion of the complainant's privacy, considerations of undue delay and time waste and the needless presentation of cumulative evidence.

*Id.* ¶ 41 (quotation simplified). Hernandez-Rivera argues that the standard expressed in *Boyd* is no longer applicable because the Utah Supreme Court has more recently "abandoned tests that go beyond the plain language of [r]ule 403," citing cases in which the supreme court has emphasized the language of the rule itself as the governing standard, *see State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (stating, in the context of the admission of rule 404(b) evidence, that "courts are bound by the text of rule 403" and not the "limited list" of "suggested factors" identified in certain prior case law (quotation simplified)), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *State v. Cuttler*, 2015 UT 95, ¶¶ 2, 18, 367 P.3d 981 (extending "*Lucero* and its logic to determinations made under rule 404(c)" and stating that "the governing legal standard for evaluating whether evidence satisfies rule 403 is the plain language of the rule, nothing more and nothing less").

¶37     We acknowledge that there exists some question as to the continued applicability of *Boyd*. Indeed, this court has previously noted that because the presumption of inadmissibility expressed

in *Boyd* "is not indicated in the plain language of rule 403" and because the supreme court "has recently repeatedly eschewed extra-textual or contra-textual judicial glosses on the Utah Rules of Evidence," "we are not certain whether this presumption continues to be applicable." *State v. Rallison*, 2023 UT App 34, ¶ 25 n.7, 528 P.3d 1235 (quotation simplified); *accord State v. Granere*, 2024 UT App 1, ¶ 80 n.26, 543 P.3d 177, *cert. denied*, 558 P.3d 87 (Utah 2024).

¶38    Nonetheless, whether there remains a presumption that evidence of a sexual assault victim's past sexual conduct is inadmissible is ultimately immaterial here where there is no indication that the district court's decision relied on the presumption expressed in *Boyd*. In the court's application of the law to the relevant facts, it did not state its findings in terms of the *Boyd* presumption but repeatedly stated its determination that the probative value of the Edmundo evidence was "substantially outweighed by" the dangers of unfair prejudice (including revealing private details regarding Sadie), confusion of the issues, and misleading the jury. Thus, the court adhered to the language of rule 403 itself and did not abuse its discretion by applying an incorrect legal standard.

## B.    The Rule 403 Balancing

¶39    The district court determined that although the Edmundo evidence had "some probative value," that probative value was "only slight." This was largely because after Sadie and Edmundo were "discovered" at the motel, the police immediately collected towels, bedding, and Sadie's underwear, and Sadie also "underwent an invasive anogenital exam" and "reported that she'd showered before" the exam.

¶40    As to the other side of the rule 403 balancing test, the district court determined that the Edmundo evidence "would have an undue tendency to suggest a decision on an improper

basis" and that there was "a great potential for improper inferences that [Sadie was] the type of person who would invite sexual contact with an older man who would willingly engage in this type of sexual conduct or that she would be trouble for older men." The court also concluded that the Edmundo evidence would be "an unwarranted invasion of [Sadie's] privacy," that "the details of the Edmundo evidence would inflame, mislead, and distort the jury's deliberative process," and "that there could be confusion of the issues because the jury would be hearing about two different cases involving somewhat similar set[s] of facts . . . that could lead to further confusion on these issues." The court determined that these dangers "substantially outweighed" the "slight" probative value of the Edmundo evidence.

¶41 Hernandez-Rivera argues that the district court's assessment of the probative value was incorrect, and he argues that "the Edmundo evidence was significant as an alternative source of the pubic hair." He points to the lengthy delay in Sadie turning the hair over to the police—occurring fourteen months after the charged conduct—and to the inconclusive nature of the eventual DNA results. But the court recognized the inconclusive DNA testing as the very reason the Edmundo evidence *did* have some probative value. However, the court determined that this probative value was considerably lessened by the circumstances surrounding the discovery of Sadie in the motel room that created a very low likelihood that Sadie would have left the Edmundo encounter with one of Edmundo's pubic hairs. And any delay that may have occurred before Sadie provided the hair to the police does nothing to increase that likelihood.[4]

---

4. Hernandez-Rivera points to Sadie's testimony that the hair was "something special" to her, and he suggests that she would have been more likely to have kept a pubic hair from Edmundo because she more valued her relationship with him more. However,

(continued…)

¶42 Additionally, Hernandez-Rivera argues that any "danger of unfair prejudice was low" because the State brought up the pubic hair evidence in its case-in-chief. Likewise, he argues that "any confusion of the issues was invited in the State's case-in-chief." But because the very purpose of the rule 412 exception at play here is to counter a piece of physical evidence being used against the defendant, *see* Utah R. Evid. 412(b)(1), it will almost certainly be the case that the State has introduced that evidence in its case-in-chief. Nonetheless, the rule 412 evidence the defendant seeks to admit still must pass the rule 403 balancing test. *See id.* R. 412(b). And Hernandez-Rivera points us to no authority indicating that the State's initial introduction of the physical evidence against him tips the rule 403 balancing test toward admission, as he suggests.[5]

¶43 In sum, Hernandez-Rivera has not shown that the district court exceeded its discretion in the rule 403 balancing it performed—neither in the court's determination that the probative value of the Edmundo evidence was "only slight" due to the way that encounter ended, nor in the court's assessment

Sadie's testimony was that the hair "was something personal . . . *from that encounter*," specifically referencing her first time having sexual intercourse with Hernandez-Rivera. (Emphasis added.) Moreover, like the other evidence pointed to by Hernandez-Rivera, Sadie's feelings toward her two abusers does not alter the fact that the circumstances surrounding the Edmundo encounter made it unlikely that Sadie left the encounter with one of Edmundo's pubic hairs.

5. Hernandez-Rivera does cite *State v. Eddington*, 2023 UT App 19, 525 P.3d 920, to support his assertion that there is no unfair prejudice when the State introduces the evidence to be rebutted. But as we discuss in the next section, *see infra* ¶¶ 45–46, 48, the facts in *Eddington* are easily distinguishable from the facts of this case.

that the risks of admitting the evidence "substantially outweighed" that slight probative value.

## II. The Cross-Examination of Mother

¶44 Hernandez-Rivera next argues that "the State was repeatedly allowed to use [r]ule 412 as a sword, not a shield, to create false impressions of Sadie's credibility."[6] He asserts that the district court erroneously denied his attempts to use the Edmundo evidence after the State had opened the door. Specifically, he points to testimony given by Mother that, he argues, "minimized Sadie's leaving the house without permission."[7]

¶45 Hernandez-Rivera's argument relies heavily on *State v. Eddington*, 2023 UT App 19, 525 P.3d 920. There, the defendant

---

6. The State argues that this issue was not preserved for appeal. But because this claim is easily resolved in the State's favor, we choose to address the merits of the claim without addressing the preservation issue. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (emphasis omitted)).

7. Hernandez-Rivera also references Counsel's "other motions to impeach Mother and Sadie" with rule 412 evidence, but he asserts that he "lack[s] the space in [his] brief to conduct detailed analysis of the circumstances of [those] other motions." But the lack of any such analysis limits our ability to evaluate these additional arguments on appeal, and we therefore do not reach them. *See generally Bresee v. Barton*, 2016 UT App 220, ¶ 30, 387 P.3d 536 ("[Appellants] have the burden to develop their arguments with reasoned analysis based on the pertinent portions of the record . . . ." (quotation simplified)).

was charged with various sexual offenses, and the trial court granted, pursuant to rule 412, the State's pretrial motion to prevent the defense from presenting any evidence of the alleged victim's prior sexual behavior and disposition. *See id.* ¶ 1. But at trial, the State took advantage of this restriction to create the false impression that the alleged victim had no sexual past, "asserting in an opening statement that [the defendant] took his alleged victim's 'virtue' and then eliciting testimony from her that she was not the kind of girl who invites guys into her bedroom or engages in certain sexual activity." *Id.* This court determined that these assertions opened the proverbial door and that defense counsel should have been allowed to question the alleged victim about her sexual past in order to rebut the misimpression that "was generated by the prosecutor and the witness themselves." *See id.* ¶ 38. The *Eddington* court stated, "[T]he [trial] court exceeded its discretion in using this pretrial ruling to act not as a shield—as the rule intends—but as a sword and an excuse to allow the prosecution and its witness to state or infer facts the court had already ruled could not come before the jury. The protections of rule 412 are to be realized only when the prosecution and its witnesses also continue to abide by the same restrictions they have asked the trial court to impose on the defendant." *Id.* ¶ 27.

¶46　Hernandez-Rivera argues that "*Eddington* is on all fours with this case" and asserts that the State similarly tried to use rule 412 as a sword against him. He asserts that the State did so when it went to "great lengths" to "create an impression that Sadie was, at worst, mildly disobedient, and an otherwise credible and trustworthy person." But this argument is unavailing.

¶47　As an initial matter, the challenged testimony here, when read in context, is arguably not contradicted by any of the information that the defense wished to present regarding the Edmundo encounter. The specific testimony Hernandez-Rivera points to as opening the door involved Mother's responses that

there were "a couple of instances where maybe . . . [Sadie] didn't stay where she was going the whole time" and that Mother "had not even recalled" the Edmundo incident. But when these exchanges are viewed in context, it is quite evident that the questioning was in reference to a specific period of time that did not include the Edmundo encounter. The first challenged exchange was as follows:

> Q.   There were times that you indicated to [the police] that, *between those times, between when you found her in the basement to the diary*—
>
> A.   Uh-huh.
>
> Q.   —that you didn't know where she was; is that correct?
>
> A.   Yes.
>
> Q.   And that she would sneak out and do things she wasn't supposed to do.
>
> A.   I wouldn't say sneak out. I always knew when she was going somewhere, and she knew what time she had to be home. There had to have been—looking back now, there had to have been a couple of instances where maybe she wasn't where she—she didn't stay where she was going the whole time.

(Emphasis added.) And when Counsel later referenced this exchange and suggested that Mother's response had been "not accurate," Mother replied, "Quite honestly, I had not even recalled that incident that you're bringing up now." Thus, Mother's initial comment was not an assertion that there were just "a couple of instances" *in Sadie's life* where she was not where she said she would be, but that there were "a couple of instances" of

that happening *in the particular time frame* that the questioning had specified. And her later reply was most likely a recognition that she had not been thinking more broadly when answering the question in the first place but was instead focused on the later time frame specified in Counsel's question. Therefore, the mention of Sadie being with Edmundo for a significant period of time without permission—which occurred several months prior to Mother finding Sadie in the basement with Hernandez-Rivera—would not actually serve to impeach Mother's testimony.

¶48    Notwithstanding our skepticism of Hernandez-Rivera's characterization of Mother's testimony as more broadly asserting Sadie's obedience or reliability, we determine that even under his characterization, where the Edmundo encounter *would* have had some impeachment value, his claim still fails. The only parts of the Edmundo encounter that would have rebutted Mother's statements would simply be the fact that there was another time that Mother was likely to remember that Sadie was not where she was meant to be for a significant period of time.[8] Unlike in

---

8. Hernandez-Rivera also "notes" other aspects of Mother's testimony that he argues helped create a misimpression of Sadie, specifically, her testimony that Sadie was an "[e]xcellent" student, had friends at school, was "extremely organized [and] always on point," started college at sixteen, and "sought independence." In addition to recognizing the obvious fact that these assertions are entirely unrelated to Sadie's sexual behavior, we also recognize that Hernandez-Rivera points to no evidence suggesting that these assertions were false. *See Eddington*, 2023 UT App 19, ¶ 39 (discussing the defendant's need "to rebut the misimpression created by the prosecution that [the alleged victim] had no sexual past—*an inference that was not factually correct*" (emphasis added)). We therefore do not see that these statements helped to create any misimpression, let alone one that was related to Sadie's sexual past.

(continued…)

*Eddington*, the asserted misimpression here did not involve Sadie's sexual history or sexual disposition, and therefore impeachment evidence rebutting the asserted misimpression would not have needed to include those details that are protected by rule 412. And indeed, this impeachment evidence is precisely what the district court allowed in this case. The court allowed Counsel's cross-examination to address "an incident . . . where [Sadie] was missing for two days," that "the police were called," that the incident "led to an investigation," and that the person involved "was charged with a serious crime." Under these circumstances, the court did not abuse its discretion in determining that the door was not completely thrown open to allow questioning regarding all aspects of the Edmundo encounter, including those aspects that would reveal Sadie's prior sexual behavior or predisposition.

---

Additionally, Hernandez-Rivera points to Mother's opinion that Sadie was "not an attention-seeker" as also feeding into a misimpression of Sadie. But the court allowed Counsel to impeach Mother on this issue, and when Counsel did so, she was successful in getting Mother to admit that Sadie's journal painted a different picture:

> Q. But from what you read from the journal, that was what she said was her intention, was seeking attention from guys.
>
> A. If that's how you interpret it.
>
> Q. But—and we're not talking about interpretations. Everybody has interpretations of different things that are said, but that—that's what was said; is that correct? In her journal.
>
> A. Yeah—yes.

Thus, Counsel was allowed to impeach Mother on this issue, and there was no lingering misimpression after she did so.

III. Ineffective Assistance of Counsel

¶49　Hernandez-Rivera asserts that Counsel provided constitutionally ineffective assistance in two respects. His first claim concerns Counsel's failure to move to introduce the Edmundo evidence after Mother referenced Sadie's virginity. His second claim concerns the failure to object to a jury instruction regarding indecent liberties.

¶50　To succeed on an ineffective assistance of counsel claim, a defendant must make two showings: "First, the defendant must show that counsel's performance was deficient," and "[s]econd, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

¶51　In considering the first required showing of deficient performance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation simplified); *see also State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330 ("Trial counsel's performance is deficient only if the alleged conduct fell below an objective standard of reasonableness under prevailing professional norms." (quotation simplified)). We determine that for both asserted instances of ineffective assistance of counsel, Hernandez-Rivera has not shown that Counsel performed deficiently, and therefore, his claims fail.

A.　The Testimony Regarding Virginity

¶52　Hernandez-Rivera's first ineffective assistance of counsel claim regards another piece of testimony that he argues "clearly"

opened the door to questioning regarding the Edmundo encounter. He bases this argument on Mother's reference to Sadie's journal revealing that Sadie was no longer a virgin as a result of sexual activity with Hernandez-Rivera.

¶53 Mother's testimony underlying this claim is the following exchange that occurred during direct examination:

> Q. Did you find anything in regards to a Felipe?
>
> A. Yeah.
>
> Q. What did—what did you find?
>
> A. She was having a relationship with this gentleman, and it indicated sexual activity, things like that.
>
> Q. Okay. Did it mention sexual intercourse?
>
> A. Well, it said that she had—wasn't a virgin.

Counsel objected, after which the district court had the attorneys approach and offer suggestions for how to cure the inappropriate answer. The prosecutor said that he had instructed Mother not to mention virginity and that the two had agreed she would instead state simply that the journal said Sadie and Hernandez-Rivera had "had sex." The court thereafter struck the last portion of Mother's testimony as nonresponsive, ordered the jury "to disregard" it, and had the prosecutor move on to further questioning in an attempt to "not draw more attention" to the exchange.

¶54 During Mother's cross-examination, when Counsel first attempted to refer to the Edmundo encounter by questioning Mother regarding Sadie previously being "found at a hotel," the district court foreclosed that line of questioning. In the discussion

that followed, the court made it clear that Counsel was not allowed to "drop bombs like that" and that the possible admission of any evidence related to the Edmundo encounter must be discussed with the court first, outside the presence of the jury. The court then conducted a lengthy discussion with the attorneys in which the court repeatedly emphasized the need to be "very, very careful" with the evidence protected by rule 412. The court specifically referred to the earlier testimony regarding virginity and recognized, "[S]ometimes, even with our best efforts to tiptoe on the line, a witness blurts out something like 'virginity.'" But the court nonetheless reminded the parties of the baseline rule that "anything related to Edmundo" was "off the table." The court then narrowly tailored the impeachment questions that Counsel wished to ask and again reminded Counsel to "stay far, far, far away from any intimation that there's sexual activity going on with other people." Thus, the court's position seemed a clear indication that it did not consider the door open to evidence regarding the sexual encounter between Sadie and Edmundo, despite Mother "blurt[ing] out" the term "virginity."

¶55 Further, Counsel likely understood that the district court was unlikely to agree that evidence of the Edmundo encounter would impeach Mother on the "virginity" reference. In its pretrial rule 412 ruling, the court had characterized the Edmundo encounter as involving sexual acts that stopped short of vaginal penetration. Therefore, it was arguable that nothing from that encounter would counter the apparent indication in Sadie's journal that she lost her virginity to Hernandez-Rivera.[9]

¶56 Considering the questionable impeachment value of the Edmundo evidence and the district court's determination to zealously enforce rule 412, a reasonable attorney in Counsel's position could have concluded that an argument that Mother's "virginity" reference opened the door to the broader introduction

---

9. The content of the journal is not a part of the record on appeal.

of the Edmundo evidence would have been futile. And the failure to make such a request does not amount to deficient performance. *See State v. Ring*, 2018 UT 19, ¶¶ 43, 47, 424 P.3d 845 (determining that trial counsel did not perform deficiently in failing to object when "trial counsel could have reasonably believed that an objection was futile"). This ineffective assistance of counsel claim therefore fails.

B.      The Indecent Liberties Jury Instruction

¶57     Hernandez-Rivera's second ineffective assistance of counsel claim concerns the jury instruction defining indecent liberties. He argues that this instruction misstated the law and that Counsel rendered ineffective assistance in approving it.

¶58     Under the statutory scheme in effect at the time of the alleged crimes, the touching prohibited by the sexual abuse of a child statute was where "the actor touches the anus, buttocks, or genitalia of any child, the breast of a female child, or otherwise takes indecent liberties with a child, or causes a child to take indecent liberties with the actor or another." Utah Code § 76-5-404.1(2) (2003). And "*any* touching, even if accomplished through clothing, [was] sufficient to constitute the relevant element of the offense." *Id.* § 76-5-407(3) (emphasis added). While the term "indecent liberties" was not defined by statute, the Utah Supreme Court had interpreted the phrase to "proscribe the type of conduct of equal gravity to that interdicted in the first part" of the phrasing. *In re J.L.S.*, 610 P.2d 1294, 1295 (Utah 1980); *accord State v. Ray*, 2020 UT 12, ¶ 27, 469 P.3d 871. That is, other touching amounted to taking indecent liberties if it was of equal gravity to the touching of the anus, buttocks, genitalia, or female breasts, either directly or through clothing.

¶59     Later, the term "indecent liberties" was statutorily defined to include "causing any part of an individual's body to touch the actor's or another's genitals, pubic area, anus, buttocks, or female

breast," *see* Utah Code §§ 76-5-401.1(1)(a)(i)(B), -404.1(1)(a)(iii) (2022). And this was the language on which the jury instruction here was based, the instruction stating, "'Indecent liberties' means causing any part of [Sadie's] body to touch the actor's genitals or pubic area."

¶60    The jury was instructed that the touching required for three of the charged counts of sexual abuse of a child was that Hernandez-Rivera "[c]aused [Sadie] to take indecent liberties with [him]." And although the jury instruction defining "indecent liberties" referred to the touching of "genitals or pubic area," the jury was additionally instructed that the three charges alleging indecent liberties were based "on the alleged conduct of [Sadie] touching [Hernandez-Rivera] on his penis" on three distinct occasions. Thus, the jury was instructed that these three charges were based on Hernandez-Rivera causing Sadie to touch him on his penis, and such touching certainly meets the requirement of the earlier statute that the charged conduct be of equal gravity to the actor touching the anus, buttocks, genitalia, or female breasts (either directly or through clothing) of the child.

¶61    Hernandez-Rivera pushes back, asserting that the jury perhaps did not believe Sadie's testimony that he caused her to touch his penis but instead convicted him based only on the belief that he caused her to touch his pubic area when he "would be shoving [her hand] down his pants," and he argues that because the touching of the "pubic area" was not specifically covered by the older version of the statute, the instructions as given "broadened the factual scenarios in which the jury would be required to reach a guilty verdict." But such reasoning fails to account for the jury instruction specifying that the three indecent liberties charges were based only on the alleged touching of Hernandez-Rivera's penis, not his pubic area. Moreover, though the definition of "indecent liberties" at the time of the commission of the crimes did not yet expressly include the touching of a pubic area, we think it highly unlikely that a jury would determine that

Hernandez-Rivera's actions would not be prohibited under the earlier statute, that is, that him shoving Sadie's hand down his pants and causing her to touch his pubic area was not of equal gravity to the touching of the anus, buttocks, or genitalia, either directly or through clothing.

¶62 Because it would have been reasonable for Counsel to have determined that these jury instructions, which specifically based the indecent liberties charges on the touching of Hernandez-Rivera "on his penis," described conduct prohibited under either version of the statutory scheme, we determine that Counsel did not perform deficiently in approving them. Thus, this claim of ineffective assistance of counsel also fails.

## CONCLUSION

¶63 The district court neither erred by incorrectly applying rule 412 nor exceeded its broad discretion in balancing the probative value and the risks of the Edmundo evidence under rule 403. And the court's refusal to allow impeachment questions to reach the sexual details of the Edmundo encounter was not an abuse of discretion. Finally, Counsel did not perform deficiently in failing to push for further impeachment with the rule 412 evidence or in approving the jury instruction defining the term "indecent liberties." We therefore affirm.

—————